# C. FRANK JONES, Administrator, Etc., *vs.* E. McC. HARBAUGH.

*Executors and Administrators—When Letters of Administration May be Granted to a Stranger Without Notice—Estoppel—Agreement to Pay Extra Compensation to Administrator in Consideration of Immediate Settlement of Estate—Allegation of Fraud Perpetrated by Distributee's Attorneys — Revoking Letters for Improper Conduct by Administrator.*

Upon the death of a man, who was found dead alone in a house, letters of administration upon his estate were granted by the Orphans' Court to the appellant, who was the coroner who viewed the body so found. He filed an inventory showing certain leasehold property, $727 in cash and over $10,000 in bank. The deceased left as his sole distributee a brother, who was a non-resident, and no near relatives in the State. A few days after filing the inventory and less than two weeks after the death of the intestate, the said brother, accompanied by his attorney, requested the administrator to make an immediate settlement of the estate, and agreed, in consideration thereof, to pay him $1,000 for his commissions and $500 as a fee for his counsel. This offer was accepted and a partial account (not including the leasehold property), was stated in the Orphans' Court by which about $600 was allowed to the administrator as commissions and about $10,000 distributed to the brother of the intestate. The sum of $9,200 was paid to the latter's attorneys, the administrator retaining the amount agreed upon less the commissions allowed in the account. Subsequently, the distributee filed a petition in the Orphans' Court, alleging that his attorneys had conspired to defraud him, paying him only $4,000 of the above-mentioned sum, and asking that the account stated be set aside and the administrator removed, etc. On appeal from an order removing the administrator, *Held,*

1st. That although the appellant had no right as coroner to administer on the estate, yet he was not improvidently or illegally appointed, since under Code, Art. 93, secs. 31, 33, administration can be granted in the discretion of the Orphans' Court, when the relations of the deceased as near or nearer than brother are non-residents of the State, and other relations or creditors fail to apply for letters ; and under Code, Art. 93, secs. 14, 16, administration may be granted forthwith when the intestacy of the decedent is established to the satisfaction of the Court, as it was in this case.

2nd. That even if otherwise entitled to ask for the grant of letters to himself, the petitioner in this case is estopped from doing so because

he had formally asked the Orphans' Court to retain the appellant as administrator.

3rd. That the letters of the administrator should not be revoked on the ground that he had been guilty of improper conduct in the management of the estate, since there is no evidence to show that he was responsible for or connected with the fraud perpetrated upon the petitioner by the latter's attorneys, and the compensation paid the administrator was only a little in excess of the commissions that would have been allowed on the estate, and was agreed to by the petitioner after a full disclosure of the facts, and in consideration of the settlement of the estate by the administrator immediately, when he could, under the law, have waited for a year, and the administrator thereby took the risk of the claims of creditors who might afterwards appear.

4th. That whether the retention by the administrator of the above-mentioned sum for his own compensation and for the fee of his counsel was lawful or not, there is no evidence of fraud on his part, and the petitioner, who, with knowledge of the facts, agreed to pay the same, executing a release, thereby obtaining an immediate distribution and causing the administrator to assume the risk of the appearance of creditors or other claimants, cannot now ask to have him removed on the ground of improper conduct, when the administrator had no suspicion of the fraud about to be perpetrated on the petitioner by the latter's chosen attorneys.

Appeal from an order of the Orphans' Court of Baltimore City.

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Roger W. Cull* and *Olin Bryan* for the appellant.

*John B. McGraw* (with whom were *Garnett Y. Clark* and *Wm. Corkran Clift* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

This appeal was taken from an order of the Orphans' Court of Baltimore City revoking the letters of administration, which had been granted to the appellant, on the estate of Charles Leonard Harbaugh, and appointing the appellee new administrator in his place. On July 4th, 1900, Mr. Harbaugh was found dead in a house in Baltimore which he owned and the appellant, who was a coroner, was sent for. He had the body

placed in a vault in St. Peter's Cemetery, where the mother of the deceased was buried, and left the house in charge of the police authorities, as there was no one living there.  At the suggestion of one of the police officers, Dr. Jones, on the 6th of July, informed the Orphans' Court that the property was under police protection and needed some disposition to be made of it.  He applied for letters of administration which were granted to him that day and he gave bond in the penalty of three thousand dollars.  The day he qualified he heard that Mr. Harbaugh had, sometime before his death, taken some money out of the house where he was found to Mrs. Hiskey's where he boarded, and he called there, but was told there was nothing there but some old clothes, which would not be delivered until the brother of the deceased from the west arrived. Dr. Jones then requested a captain of police to send an officer for the money and on Saturday night he was informed that they had found eleven thousand dollars.  Upon going to the police station he ascertained they had found money and bank-books, but the captain told him he could not get the money until it was turned over to the police department.  On Monday, July 9th, he got the money and the bank-books and then consulted his counsel, Mr. Bryan, who advised him to file an inventory at once, which he did on July 11th.  That contained personal chattels, &c., amounting to $76.00, two leasehold properties appraised at $1,200.00, $727 cash in the house at the time of deceased's death and $10,660.97 in bank—in all $12,663.97.  The Orphans' Court ordered him to give an additional bond of $22,000, which was afterwards done.

Dr. Jones had heard that the deceased had a brother living in Illinois and Mr. Bryan advised him that he must make every effort to locate him and as Mr. Bryan was going to Chicago on other business it was arranged that he should try to do so. He was to start Saturday afternoon, the 14th of July.  That morning Mr. Winternitz, of the law firm of Quinn & Winternitz, called at his office and informed him that his firm represented the brother, who was then in the city.  While Mr. Winternitz was there Dr. Jones came in to deliver a paper which he

thought would aid Mr. Bryan in locating the brother. He was introduced to Mr. Winternitz and was informed that he represented the appellee and that he was in the city. Mr. Winternitz proposed that he or his partner be associated with Dr. Jones as co-administrator, but that was declined and Dr. Jones offered to retire from the estate. Mr. Winternitz replied that they did not want that and said they desired an early settlement of the estate. It was finally agreed that if the Court and the bonding company which was security for Dr. Jones consented, a settlement should be made and they also agreed that Dr. Jones should be permitted to retain $1,500—$1,000 for his own commissions and $500 for Mr. Bryan, his counsel. On July 16th, two checks were drawn to the order of Quinn & Winternitz, attorneys, one for $500.00 and the other for $8,700.00. The one for $500.00 bears the date of July *10th*, in the record, but the testimony shows conclusively that both were given on the *16th*, and what appears to be the " 10th " was either intended for the " 16th " or was unintentionally written the " 10th " by Mr. Bryan, who wrote the checks.

On the 17th of July, the appellee executed a release, which was regularly acknowledged before a Notary Public, and on the 18th the appellant stated an account in the Orphans' Court, which after deducting expenses, collateral inheritance tax and U. S. Internal Revenue Tax, distributed to the appellee $10,181.76. The commissions allowed the administrator in the account were $633.19, which were to be deducted from the one thousand dollars agreed upon, and he was also to pay Mr. Bryan out of the balance in hand. That still left $114.95 in the administrator's hands, but his testimony shows that the two checks amounting to $9,200.00 were given before the account was stated and he was to settle for any balance that was not included in those checks, as this was not a final account, the leasehold property and personal effects still being undisposed of. Messrs. Quinn & Winternitz only paid the appellee $4,050 out of the amount received by them—they claiming that under a contract they had with him they were entitled to be allowed for certain expenses and fifty per cent of the bal-

ance. The appellee received that amount and went to his home in Illinois. After getting there he received a clipping taken from a Baltimore newspaper referring to the transaction, and, after taking advice, filed a petition on the 20th day of August, 1900, in which he charged Messrs. Quinn & Winternitz and others with a conspiracy to defraud him and alleged that the appellant " entered into and aided the above mentioned parties in the perpetration of the fraud." The petition prayed that the account of the administrator be reopened and set aside, that he be removed and a new administrator appointed ; that the commissions of Dr. Jones be disallowed and for general relief.

As the record shows that proceedings have been instituted against Messrs. Quinn and Winternitz and others, we do not intend, in what we say, in any manner to pass upon the questions therein involved, or determine whether they were guilty of the fraud charged against them, but will, as far as possible, confine ourselves to the action of the Court below in removing the appellant and appointing the appellee in his place—that being the subject before us.

1. The majority of the Judges of the Orphans' Court, as shown by their opinion, reached the conclusion that the letters were improvidently granted and therefore should be revoked for that reason and because the petitioner "has been fraudulently deprived of a large sum of money by administrator Jones." We will consider the reasons for removal in that order. Some confusion has arisen in this State as to *when* the Orphans' Court can grant letters of administration—especially to one not entitled to them by reason of his relationship with the deceased. Section 14 of Art. 93 of the Code provides that "Whenever any person shall die intestate, leaving in this State personal estate, letters of administration may *forthwith* be granted," etc., while by section 16 it is provided that "It shall be incumbent on the person applying for administration to prove such dying intestate to the satisfaction of the Court, unless the same be notorious" and then, after authorizing the Court to examine into the facts, concludes by saying "No such

administration shall be granted until at least twenty days after the death of the supposed intestate, and at least seven days after application therefor." It was decided by this Court at the January term, 1901, in *Williams* v. *Addison, ante,* p. 41, that the latter clause did not apply when the fact of the deceased dying intestate was notorious, or was proven to the satisfaction of the Orphans' Court, as otherwise section 16 would be in conflict with section 14, which authorizes the Court to *forthwith* grant the letters. If then the dying intestate was notorious, or was proven to the satisfaction of the Court, it had the power to grant letters within the twenty days, and the mere fact that they were granted within that time did not make them invalid, as the presumption would be that such dying intestate was notorious, or was proven as required. There is no evidence in this case that it was not one or the other. In the case of *Williams* v. *Addison,* letters were granted to one not related to the decedent within five days from his death, an only surviving sister having renounced the right to administer, and no other person being entitled to notice before letters were granted, and they were held to be valid.

Section 31 of that Article is, "If there shall be neither husband, nor wife, nor child, nor grandchild, nor father, nor brother, nor sister, nor mother, or if these be incapable, or decline, or refuse to appear on proper summons or notice, *or if other relations and creditors shall neglect to apply, administration may be granted at the discretion of the Court.*" And by section 33 it is provided "It shall *not be necessary to give notice* to a party entitled to administration *if he be out of the State,* nor shall it be necessary to summon or notify collateral relations more remote than brothers and sisters of the intestate, in order to exclude them from the administration; and no relations, except a widow, child, grandchild, father, brother, sister or mother shall be considered as entitled *unless they shall apply for the same.*" It is conceded that the appellee is the only brother and the nearest relation to the deceased.

He had no other relations who were entitled to letters *unless they applied for them, and no creditors applied.* The ap-

pellee was not entitled to notice as he was out of the State and therefore if letters had been granted, before he applied to the person next entitled, he could not have had them revoked. *Ehlen* v. *Ehlen*, 64 Md. 360. There being no one who was entitled to letters unless he applied, "administration may be granted at the discretion of the Court." Art. 93, sec. 31. So in the absence of fraud or mistake, the appellee could not have had the letters revoked, if he had applied on the ground that he was first entitled. But he did not even apply but filed a petition in the Orphans' Court on July 16th, in which he stated that he was "so circumstanced as to be unable to give personal supervision to the settlement of the estate of his deceased brother, and is willing to acquiesce in the appointment of the said Caspar F. Jones, and to ask that his letters of administration be not revoked until the estate of his deceased brother is closed." That petition was not only signed by him but was sworn to by him. It is true that he now alleges that he was imposed upon by his attorneys in this respect, as well as others which we shall have occasion to refer to, but if that be admitted (although we express no opinion on that subject for reasons we have stated) there is nothing in the record which authorizes the charge that Dr. Jones in any way took part in that. There can be no question about the fact, even from his own testimony, that the appellee fully understood that he was not only relinquishing any right he had to administer, but was recommending the continuance of Dr. Jones. He not only did that by his own petition, but on July 17th, he united with Dr. Jones in an answer to the petition of H. A. Helmling, who had applied to be appointed, in which he expressed the desire that Dr. Jones be continued and said his appointment met with his approval. Having so acted, he is not now in a position to withdraw his declination and ask that the party, whom he thus endorsed, be removed on the ground that he was not entitled to the office even if he was otherwise entitled to administration. It is too late for him now to withdraw it as his declaration was final and irrevocable. *Carpenter* v. *Jones*, 44 Md. 625; *Stocksdale* v. *Conaway*, 14 Md. 99; *Lutz*

v. *Mahan*, 80 Md. 232.   In those cases the declarations were filed before the letters were granted, but the principle is the same.   There is no evidence that Dr. Jones was guilty of fraud or a misrepresentation of the facts when he obtained the letters.   There was then no one in the State entitled to notice and no one had applied for letters.   Nor was there any fraud on his part which induced the appellee to file the petition and answer above referred to, although they are not necessary to sustain the appellant's original right to the letters which had been granted to him by the Orphans' Court under the discretion vested in it by the statute, in the absence of some relation or creditor applying.   He cannot, therefore, be removed on the ground that letters were improperly granted to him.

2. In what we have said, however, we do not refer to the right of the appellee to now administer, if the appellant has since been guilty of any act that authorized the Orphans' Court to remove him, and we will next consider that branch of the case.   In doing so it is important that we bear in mind the relations of the various parties to each other.   There is nothing in the record to justify the conclusion that Dr. Jones was in any wise connected with, or responsible for the conduct of Messrs. Quinn and Winternitz, by which the appellee claims he has been defrauded.   He certainly had nothing to do with them before the appellee came to Baltimore.   He did not even know the attorneys until after their employment by the appellee and after he reached Baltimore, and there was nothing to cause him to suspect that they were attempting to take any advantage of the appellee, who had not only given them a power of attorney which gave them full authority to act for him, but he took part personally in the transactions.   He signed and swore to the petition and swore to the answer above referred to, executed a release in which it was stated that the sum of $11,387.97, "less Court cost and expense, including funeral expenses, etc.," was distributed in the account—that being the amount of the inventory less the personal effects and leasehold property—he was at Mr. Bryan's office on Saturday and on Monday he was at the office of

Messrs. Quinn & Winternitz, when Dr. Jones handed Mr. Winternitz the checks.   There is not a particle of evidence from which it can be fairly inferred that Dr. Jones had any knowledge of the alleged agreement between Harbaugh and his attorneys, and the settlement made by them with him was after Dr. Jones left that office.   After that was done he made no complaint to Dr. Jones, but accepted the money his attorneys gave him, and it was not until after he had gone home and was there persuaded by his friends that he had been defrauded, that he made any complaint against Dr. Jones, which he did for the first time by the petition filed in this proceeding. It may be, and doubtless is, true that the appellee is not a man of much business experience, but he could read and write, was fifty-four years of age, had a son with him, and was represented by two attorneys of the Baltimore bar whose integrity Dr. Jones had not, as far as the record discloses, the slightest reason to question at that time.   If an administrator is to be held responsible under such circumstances for alleged unfair dealings between a distributee and his attorneys, it would seem to be impossible for one to relieve himself of liability.   They   were   Mr. Harbaugh's   attorneys—not Dr. Jones'.   His employment of them of itself was in law an assurance to any one dealing with them that he could properly do so, within the scope of their employment, but it is not necessary to rest our decision on the presumption of law arising from the relations between the appellee and his attorneys, for he acted himself in these matters.

The only conduct of Dr. Jones, reflecting upon this appeal, that can be at all questioned was his demand for the thousand dollars for himself and the five hundred for his attorney, and upon that this case must be determined.   A number of minor matters were referred to by counsel for the appellee.   Dr. Jones was criticised for returning with the inventory "cash in house at the time of deceased's death $727.00," and it was said it was done to give him, "a plausible standing, as coroner, in the estate,"—referring, we presume, to the provision in the charter of Baltimore requiring coroners to deposit in

bank, subject to the order of the Judges of the Orphans' Court, money and other effects found upon the persons of those over whom they shall hold inquests.   That Dr. Jones had no right as *coroner* to demand letters cannot be, and is not, questioned.   But the return in the inventory referred to is not only not subject to such criticism as has been passed on it, but was in accordance with the facts.   That money was found in the house where the deceased lived.   It is true his body was found in a house owned by him on Arlington avenue, but he boarded at Mrs. Hiskey's, on Lombard street, where the money was found, which house he left on Sunday afternoon and was found dead the following Wednesday.   The return was therefore properly made.   As to the appraisement of books which was alleged to have been too low, the appraisers fixed their value and no possible injury was done the appellee by it.   Other comments were made on acts of Dr. Jones, but unless we assume that he was connected with the alleged fraud of the appellee's attorneys and others, which the evidence does not justify, or convert suspicions into facts, there is nothing to authorize us to impute any unfair dealings to him, unless it be this demand for the compensation to him and his attorneys.   In most instances there is no foundation even for suspicion, unless there first be the assumption that he was in collusion with the parties accused of the conspiracy to defraud the appellee.

Under the law Dr. Jones could not have been compelled to settle an account until the end of the year.   He could not make distribution of the assets of the estate to the appellee until after the expiration of the six months' notice provided for by section 109 of Art. 93, excepting at the risk of himself and his surety.   Although he was satisfied that there were no debts, of which he had no notice, it was impossible for him to be certain of that, and, if there had been, it would not have been the first case on record in which an administrator had acted on the assumption that there were no debts and afterwards ascertained to his sorrow that he was mistaken.   That the appellee was in Baltimore, anxious to leave and desirous of having an

immediate settlement of the estate, cannot be denied.   That he
agreed to allow the compensation demanded, if a settlement
was made at once, is beyond all controversy.   He said Mr.
Winternitz had told him that it was necessary in order to get a
quick settlement out of the coroner to give him something,
that he had offered him eight hundred dollars but he wanted
two thousand dollars.   Mr. Winternitz swore that he told him
that it was fifteen hundred dollars that Dr. Jones demanded,
and that the debts were about five hundred dollars, which would
be two thousand dollars, or a little more, that would come out
of the estate, and the appellee said if that was the best he could
do he was perfectly satisfied.   Mr. Harbaugh said his recol-
lection of the amount named in the release was $10,523.78
which is the exact amount which was distributed to him in this
account before the collateral inheritance tax, and U. S. Reve-
nue tax were deducted.   He said in reference to the payment
to him "after Mr. Jones had departed, Mr. Winternitz reached
forward this check for $8700 and then he commenced to ex-
plain to me about what the money was for; $200 for funeral
expenses ; turning to me he said that d——n Knott must have
had a whole generation at the funeral; $250 for State tax, $150
for government tax, $57 that was retained by Mr. Jones for
Court costs, *and the balance went to the coroner.*"   The amount
allowed Dr. Jones in the account, excluding commissions and
including the taxes was $573.02 intead of $657 the aggregate
of what the appellee says Mr. Winternitz told him was taken
out.   Dr. Jones testified that he handed the two checks to Mr.
Winternitz in the presence of Mr. Harbaugh, but according to
the latter he did not get any part of the $500.00 check.   In
the petition filed by the appellee on July 16th, it was stated
that the administrator was willing to pass an account and, as
there would only be "about fifteen hundred dollars worth of
property remaining in the hands" of the administrator, he asked
that he be not required to file the additional bond, although it
was filed.   So even taking the testimony of the appellee him-
self, it is perfectly apparent that he knew what the estate
amounted to, how much the administrator was to distribute in

the first account, how much he would retain for future distribution, and what he kept for himself and his attorney. It is impossible to reach the conclusion, from the evidence, that Dr. Jones in any way deceived him in reference to those matters, but on the contrary he made as full a disclosure of all the essential facts as could have been expected of any one who was thus dealing with one represented by counsel. Upon no theory can he be held responsible for the alleged fraud of the counsel, unless he knew of it or at least had reason to suspect it, and there is no evidence of either.

The compensation Dr. Jones asked for himself was not unreasonable. It was just a little over seven and one-half per cent on the inventory. When he was taking the risk of claims being filed in excess of the amount he retained in hand, it is not probable that the Orphans' Court would have hesitated to allow that amount of commission, if it had been requested to do so, as it had the discretion to allow commissions not exceeding ten per cent. If it had been allowed the maximum, it would have amounted to a sum only $233.61 short of the $1,500.00 retained. The proper course to have pursued was to have asked the Orphans' Court to allow the appellant the thousand dollars and counsel fees, but as the appellee was the party entitled to the estate, after payment of expenses and debts, and he had agreed upon the amount, it does not follow that any fraud was attempted or intended by settling between themselves, especially as a final account was not to be then filed. The account being prematurely settled, no one was bound by it but those who were parties to it. At the time the settlement was made there was then pending in the Orphan's Court the application of Henry A. Helmling, a cousin of the deceased, for letters on the estate. That was filed on July 12th, and although it was dismissed on the 17th, it was proper to have counsel represent the administrator, so as to see that it was effectually disposed of. Other services had already been required of counsel and Mr. Bryan agreed to defend any suits or proceedings that might be instituted. It was impossible to tell at that early day what would be the ex-

tent of such services before the estate was finally settled.
The fee retained might or might not be adequate compensa-
tion for the services he had obligated himself to perform—de-
pending altogether upon what claims might be asserted
against the estate within the six months allowed by law.    It
was possible that a will would be produced leaving the prop-
erty to parties other than the appellee.    It is true that Dr.
Jones was of the opinion that there was none, but if he had
been mistaken, he would have assumed great risk in thus pre-
maturely paying out the money in hand, and the attorney, who
advised with him, would undoubtedly have been censured by
the administrator if he had thereby sustained loss.    When,
therefore, the attorney, upon whose advice he was acting, was
fixing his compensation he would naturally make it higher
than if his client was taking the ordinary risk of distributing
an estate at the time fixed by law.

But it is not necessary for us to determine whether the re-
tention by the administrator of this fee and his own compen-
sation was lawful, as the question is whether the Orphans'
Court was right in removing him for *fraudulently* depriving
the appellee of money he was entitled to.    The order ap-
pealed from was passed at the instance of the appellee, who
not only gave his assent to the administrator's retaining this
amount, but thereby induced him to settle the account at a
time he was under no obligation to do so, and when he nec·
essarily assumed great risks.    Has he who thus acted the
right to have the administrator removed for agreeing to do
what he agreed should be done ?   It is right that persons oc-
cupying positions of trust be held to strict accountability in
the discharge of their duties, but when they are dealing with
those competent to act for themselves, especially when the
latter are represented by counsel, and give them all the infor-
mation that can be reasonably expected, there is quite as much
danger of fraud from the *cestui que trust* as from the fiduciary,
if unvarying rules are to be adopted and enforced in favor of
the former.    It does undoubtedly require close scrutiny on
the part of Courts when those occupying positions of trust

seemingly act in a way by which they may take advantage over those they represent, but all dealings between such parties are not necessarily void or fraudulent.

There are many provisions in Art. 93 of our Code which authorize the Orphans' Court to revoke letters granted to administrators, but none of them in terms apply to a case such as this unless it be section 230 by which the Court has power to "superintend the distribution of the estates of intestates, secure the rights of orphans and legatees, and to administer justice in all matters relative to the affairs of deceased persons." Under the construction placed on it by this Court in *Carey* v. *Reed*, 82 Md. 382, if the administrator had been guilty of taking part in the fraud charged by the appellee against his attorneys, or had *fraudulently* withheld from him money to which he was entitled, that section, it may be conceded, is broad enough to confer jurisdiction on the Orphans' Court. For although it has not the power to set aside the release executed by the appellee, as that is vested in Courts of equity, *Shaffer* v. *Shaffer*, 82 Md. 554, yet if the administrator had *fraudulently* obtained that release and refused to pay the money distributed to the appellee, it would have been such conduct as would have authorized the Orphans' Court to remove the administrator from the further administration of the estate. There is a wide difference between setting aside a release, so that it can no longer be a bar to recovery of the amount affected by it, and inquiring into alleged fraud connected with it, so that the fraud, if proven, may be used to show that the party guilty of it is not a suitable person to be continued as administrator. If the administrator had imposed on the appellee and obtained the release by fraud, the Orphans' Court would not be so helpless in its supervision over one of its appointees, as to be precluded from such inquiries for the purpose of determining whether he should be permitted to continue in his position.

But as we have already said, we do not think the facts of this case justify the conclusion that Dr. Jones was guilty of fraud in obtaining the release. He believed, and had the

right to believe, that the appellee fully authorized the settlement he made, as he did in fact authorize it, and it is equally clear that he thought he had the right to make it. We need not determine whether such an arrangement can be validly made between an administrator and a distributee. The question is whether he should be removed at the instance of the distributee merely because he did make it, although he did so with the full consent of the distributee and with the belief that he was justified in doing so. He acted under the advice of a prominent member of the bar who was, and still is of the opinion, as we are assured from his testimony, that the settlement was perfectly legal and valid. The compensation retained for himself was not excessive and the only mistake he made in reference to that was in not asking the Orphans' Court to fix that amount, instead of a less sum, when he settled his account, and, if he had, it might have with perfect propriety been allowed under the circumstances. His retention of the fee for his counsel was (at least as he had a right to believe, if not actually) with the consent of the appellee. No demand was made on him for the amount he has thus withheld in pursuance of the arrangement, but the first knowledge he had of any dissatisfaction on the part of the appellee was this petition which charged him with fraud. Of course, we do not mean to intimate that one occupying a position of trust can be excused for a fraudulent act because he has acted under advice of counsel or because the one defrauded has, without knowledge of the fraud, consented to the transaction. But if he believes he has the right to make an agreement with his *cestui que trust*, and is so advised by reputable counsel, and then makes it openly and without imposing on his *cestui que trust*, who is *sui juris* and himself represented by counsel, there can be no necessity to announce such a harsh rule as that he must be removed, merely because he exceeded his authority, if that be conceded. Especially is this so when the application to remove him is made by the other party to the arrangement who as we find from this record, was made acquainted with all the facts necessary to enable him to know

what he was doing. The provisions in the Code authorizing the removal of administrators do not contemplate such severe dealings with them. For example, sec. 239 of Art. 93, only authorizes the Orphans' Court to remove an administrator, who has even been guilty of concealment of the assets of his decedent, after failure to comply with its order to file an additional inventory or lists of debts, and it would be going very far to remove one who has retained money, with the consent of the party entitled to it, in the full belief that he had a right to do so, without the Court first determining that it was improper and directing him to account for it, thus giving him the opportunity to correct his error and refund, if that be determined to be necessary.

Before concluding this opinion, we deem it our duty to say that this record not only contains a great deal of evidence that is wholly irrelevant to the questions involved in this appeal, but there has been a great deal of unnecessary costs incurred by inserting what seems to be a stenographic report of arguments of counsel and comments of the Court made during the progress of the trial. There are nearly fifty printed pages of that character, and an opinion of one of the Judges of the Orphans' Court in reference to other parties covers ten pages of the record. Such practice not only violates the rules of this Court and adds unnecessary labor to it, but imposes useless costs on litigants, as has been done in this case.

Being satisfied that the appellant was not a party to the fraud alleged to have been perpetrated on the appellee, or even guilty of any intentional misconduct towards him, we must reverse the order of the Court below, removing him.

*Order reversed, the costs to be paid by*
*the appellee.*