SMITH ET AL., EXECUTORS *v.* WALLER

(Two Appeals In One Record)

[No. 226, September Term, 1960.]

*Decided April 7, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Moses Cohen* and *W. Lee Harrison,* with whom were *Richard C. Murray* and *Smith & Harrison* on the brief, for the appellants.

*Fred Oken,* with whom was *James A. Pine* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Minna Waller, widow of Max J. Waller and an income beneficiary for life under his will, petitioned the Orphans' Court for Baltimore County to remove the appellants, Nathan Smith and Helen Corkran, as executors and trustees of his estate. She alleged in her petition that they were derelict in their duties as executors and subject to removal because (a) they had not filed an inventory within three months of the grant of their letters, and (b) this failure and their added failure to supply her with information about the "financial condition" of the estate caused her "to suffer grievous mental concern, grave emotional disturbances, and serious and severe anxiety concerning the estate."

The appellants filed the inventory, showing an estate of some million and a quarter dollars ($146,788.45 as the value of a sole proprietorship and the rest the appraised value of stocks of two wholly owned corporations), and it was accepted and approved two days after the petition for removal was filed (two weeks after the expiration of the three months' period). Later, after a hearing, the Orphans' Court removed appellants and appointed Mrs. Waller, one of her lawyers, and, over his prior express objection, one of the lawyers for the appellants, as successors.[1] The original executors appealed to this Court.

Max Waller's will gave all his tangible personal property to his wife and the rest and residue to the appellants

---

1. No explanation was given as to why the three individuals were named by the court. The will and codicils named a Baltimore bank as substitute or successor executor and trustee if either Nathan Smith or Helen Corkran (or both) were unable to act or continue to act as executor or trustee.

as trustees, the income from one-third to go to his widow for life. The trustees were authorized and directed to pay from principal, in their discretion, such sums as might be necessary for illness or medical care "or to maintain my said wife in the standard of living to which she has been accustomed."

The testimony was that Nathan Smith was a lifelong friend of the testator and his accountant and business associate for many years, and that Helen Corkran was the office manager of the several Waller corporations and business interests and had been the testator's personal secretary for twenty-two years.

Mr. Waller died on March 16, 1960. Letters testamentary were granted to appellants on April 1. Thereafter, Mr. Smith arranged a meeting of the widow and the lawyer who drew the will and was counsel for the executors (a lawyer of long experience and of outstanding reputation and stature in the field) so that he could read and explain the will to Mrs. Waller. Mrs. Corkran procured the life insurance policies on Mr. Waller's life, which were payable to Mrs. Waller, and arranged for the proceeds to be paid to her.

The fact that title to the family home passed to Mrs. Waller as a joint owner was confirmed to her. The appellants paid Mrs. Waller weekly sums for the household expenses as Mr. Waller had done and $2,000 in addition, and also paid some $6,000 in bills, part representing debts due before Mr. Waller died but most for those incurred after.

Mrs. Waller's testimony was that she had wanted to know if the family could continue to live after her husband's death as they had before, so she called on Mr. Smith at his office about three weeks after her husband died to find out the size of the estate, and he asked her to be patient. He then went on a vacation, and, so did she. About June 1, she and a family friend and advisor met with the executors and were told that Mr. Smith was working on the figures of the various businesses and to be patient. Several times in June she went to the office of the various Waller companies, of which she was an officer, to sign checks, and asked Mrs. Corkran if

the balance sheets were ready. Mrs. Corkran said Mr. Smith had the records and, after calling him, would say the figures were not ready. A meeting was arranged for June 22 at the office of the lawyer who drew the will and who was counsel for the estate, at which the figures were to be gone over and explained. Mr. Smith's mother-in-law died on June 22 and the meeting was postponed. Mrs. Waller's brother, a lawyer, told her the inventory would have to be filed within three months of April 1, and her testimony leaves the definite impression that after the postponement she, at her brother's suggestion, deliberately avoided a meeting and awaited the expiration of the statutory period so that she could act if no inventory were filed. She said that from her husband's death until she filed the petition in the Orphans' Court, she submitted bills to the executor exactly as she "had done previously" and the executors paid the bills and the weekly living expenses.

Mrs. Corkran explained that after the postponement of the June 22 meeting she asked Mrs. Waller, who was in the office to sign company checks, when she wanted another meeting and was told by Mrs. Waller that she was going to Canada and would be away until after the fourth of July. Mrs. Waller telephoned Mrs. Corkran on July 6 to say she had not made the trip and, on a visit to the office the next day, said she would be too busy with guests at her home for the next week to meet with the executors. The Orphans' Court summons of July 12 to show cause why the executors should not be removed followed without prior warning.

Mr. Smith's version of the matter was that just after the appointment of the executors he was swamped with income tax work, including that of the Waller businesses, that then he had to straighten out various operating difficulties of the Waller oil companies, that because of the "cross ramifications" and inter-relations of the Waller sole proprietorship and of the two Waller corporations, it was necessary to get an extension to file the income tax returns, that the profit and loss statements could not be finished until the end of May or early in June, and that he then started working on

the balance sheets. Before the scheduled meeting of June 22, he said he had everything in order to prepare and file the inventory and that he had made up a seventeen-point memorandum of points to discuss with Mrs. Waller and the lawyers at the meeting which was never held. He said that at the earlier meeting Mrs. Waller, at the suggestion of the family friend and advisor, demanded that the executors pay her more income each week, buy her a Thunderbird automobile and a mink coat, and employ her brother as lawyer for the Waller companies. The weekly payments were increased from $135.00 to $200.00 but the other demands were flatly refused. Although he had not given Mrs. Waller detailed information, he had told her then that she had nothing to worry about financially and that whatever she wanted "within reason" she could have. He explained that on advice of counsel the executors had refused to let the brother see the company minute books as he had requested, and that he (Smith) had directed that individual employees of the Waller companies stop talking to Mrs. Waller, as it was undermining the companies.

It is apparent from the evidence produced before the Orphans' Court that its action in removing the executors was unwarranted. Code (1957), Art. 93, Sec. 239, deals with removal of executors for various reasons. It provides that if an executor does not exhibit an inventory within three months of the date of his letters a summons to show cause why the inventory has not been exhibited may be issued, and if the executor does not, on appearing, "show cause satisfactory," the court may revoke his letters. The cases have put a gloss on the statute, holding that "The right to administer is a valuable one, and an executor or administrator will not be removed except for legal and specific causes * * *. The testamentary law affords ample means of compelling an administrator to proceed with the proper discharge of the duties of his office. Removal, therefore, is usually the last resort." 1 Sykes, *Maryland Probate Law and Practice,* Sec. 503, p. 465. This Court has said and held repeatedly that, although an executor will be unhesitatingly removed for serious

cause, yet, in the absence of fraud, bad faith, collusion or breach of trust and prejudice to the estate, letters will not be revoked until the executor in default has failed to comply with an order to make good his default or omission. *Belt v. Hilgeman, Brundige Co.,* 138 Md. 129, 136; *Stake v. Stake,* 138 Md. 51, 53; *Bates v. Revell,* 116 Md. 691, 695; *Jones v. Harbaugh,* 93 Md. 269, 284; *Fleishman v. Kremer,* 179 Md. 536, 541, 542; *Fulford v. Fulford,* 153 Md. 81, 92. Cf. *Bowers v. Cook,* 124 Md. 567, 576.

In *Kerby v. Peters,* 172 Md. 1, 6, the Court said that if the petitioners persuaded the court that the administrator "had concealed or had in her possession assets of the estate which she had omitted to return in the inventory or list of debts, the court should have required her to make return thereof, and, upon her failure to make such return, have revoked her letters," and went on to say "But, in the absence of fraud or bad faith, her letters should not have been revoked until she had failed to comply with an order directing her to make return of property determined by the court to be assets of the estate * * *."

In the case at bar neither fraud nor turpitude is charged, or shown. The filing of the inventory was but some fourteen days late and caused no prejudice to the estate or the beneficiaries. It would seem that the inventory might well have been filed in time if Mrs. Waller, after the postponement of the June 22 meeting, had not avoided a later meeting with the executors and their counsel, at which the figures were to be gone over, and to this extent she shares the blame for its late filing. Cf. *Bowers v. Cook,* and *Fulford v. Fulford,* both *supra.*

Mrs. Waller's petition specifically cited and relied only on Section 239 of Article 93. In this Court it is urged that the conduct of the appellants demonstrates their basic unfitness to continue as executors and that, therefore, the provisions of Section 259 of Article 93 of the Code ("The Court shall have full power to * * * secure the rights of orphans and legatees and administer justice in all matters relating to the affairs of deceased persons * * *.") justified the action of

the Orphans' Court. This section has been held to warrant removal of administrators or executors only in cases in which, unlike the case at bar, there has been fraud, bad faith, a conflict of interest on the part of the fiduciary or wilful or continued disregard of a positive order of the court, as for example in *Carey v. Reed,* 82 Md. 383, 395, and *Tsaraclis v. Characklis,* 176 Md. 28, 34.

The case reveals a clash of personalities and a wish on the part of Mrs. Waller to have as executors and trustees individuals who are more compliant than appellants and who take a broader and more sympathetic view of what is necessary to maintain the standard of living to which she is accustomed. It was her husband's right to select the fiduciaries who were to exercise their judgment and discretion in administering his estate, not hers. The executors could have been more tactful and polite but any shortcomings in this regard are not legal grounds for removal, and Mrs. Waller's attitude and demands, to some extent at least, would seem to have induced the reaction they exhibited.

The order of the Orphans' Court appealed from must be reversed.

*Order reversed, appellee to pay the costs.*