(Surrogate's Court, Westchester County. July, 1902.)

**1. ADMINISTRATION—ALIEN INTESTATE—POWERS OF FOREIGN CONSUL.**

Under article 9 of the treaty between the Argentine Republic and the United States, providing that if any citizen of the two contracting parties shall die, without any will, in any territory of the other, the consul of the nation to which the deceased may belong shall have the right to intervene in the administration of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs, made applicable, by the "Most Favored Nation" clause of the commercial treaty of 1871 with the kingdom of Italy, to such kingdom, an Italian consul is entitled to administer the property of all Italian subjects dying intestate within the consular jurisdiction, and after administration to send the surplus to the next of kin in Italy.

**2. TREATIES—CONSTRUCTION.**

In the construction of treaties, the legislation in regard to them and the executive acts under them should be considered.

**3. SAME.**

In cases of doubt, treaties should be interpreted according to international law.

**4. SAME—ENFORCEMENT.**

The fact that a treaty cannot be reconciled with the state law is no reason why it should not be enforced by a state court.

In the matter of the estate of Gaetano Lobrasciano. Application for decree turning over the proceeds of the estate to the consul general of Italy. Decree rendered.

D. Humphreys, for consul general of Italy.

Burton C. Meighan, for Union Sav. Bank of Westchester.

SILKMAN, S. The consul general of Italy applies to this court for a decree, under section 2709 of the Code, directing the Union Savings Bank of Westchester to turn over to him, for the purpose of administration and payment of debts, and export of the surplus to the next of kin, who are subject of the kingdom of Italy, certain moneys in the possession of said bank belonging to the decedent, an Italian subject who died in this county intestate. No answer is filed, and the facts are admitted. The application would be granted upon the authority of In re Fattosini, decided by this court (33 Misc. Rep. 18, 67 N. Y. Supp. 1119) without comment, were it not for the decision of Surrogate Thomas in Re Logiorato, 34 Misc. Rep. 31, 69 N. Y. Supp. 507, in which he questions the correctness of the decision of this court in the former case. The great respect in which the opinions of the learned surrogate of New York county are held compels this court to review the question as to the authority of the consul general of Italy, under treaty provisions and under the law of nations, to make this application.

It was held by this court, in the Fattosini Case, that the consular and commercial treaties between the United States and the kingdom of Italy, by virtue of the "Most Favored Nation" clause of the commercial treaty of 1871, embraced the privileges granted by the ninth article of the treaty between the United States and the Argentine Republic, and gave the consul general of Italy the paramount right to take possession of and administer the estates of Italian subjects dying intestate within his consular jurisdiction.

Article nine of the treaty with the Argentine Republic is in this language:

"If any citizen of the two contracting parties shall die, without will or testament, in any of the territories of the other, the consul general or consul of the nation to which the deceased belonged, or the representatives of such consul general or consul in his absence, shall have the right to intervene in the possession, administration, and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs." 10 Stat. 1009.

Surrogate Thomas says in respect of this provision:

"It will be observed that the right assured to the consul general is to 'intervene,' and this intervention is to be 'conformably with the laws of the country.' To intervene is 'to come between' [Webst. Dict.], and the right to intervene in a judicial proceeding is a right to be heard with others who may assert demands or defenses. It is not a right to take possession of the entire corpus of a fund which is the subject of the proceeding. A right to intervene 'conformably with the laws' of the state of New York is something different from a right to set aside the laws of the state, and take from a person who, by those laws, is the officer intrusted with the administration

77 N.Y.S.—66

ef estates of persons domiciled here, and who leave no next of kin within the jurisdiction, the right and duty of administering their assets."

In considering the conclusions of the learned surrogate, we must determine whether the interpretation given by him to the word "intervene" is not too restricted. He gives to it only that meaning which it has under the state law relating to state practice, to come in and be heard, or, more correctly, to come between and be heard. He does not give to it its full meaning in its ordinary sense. To intervene is to come between; "and to be heard" is added to the definition only by local legal signification and usage. It is true that, in the interpretation of treaties, the same general rules are adopted which apply to the construction of statutes, contracts, and written instruments generally, in order to effect the purpose and intention of the makers. Wilson v. Wall, 6 Wall. 83, 18 L. Ed. 727; U. S. v. Rauscher, 119 U. S. 407, 7 Sup. Ct. 234, 30 L. Ed. 425. Nevertheless, there is this difference: That the language of treaties in most instances, as it comes for interpretation or construction, is but a translation from a foreign tongue, and there would be great danger of violating the spirit of such an instrument were we to bear too heavily upon the local technical definition and use of a word. See U. S. v. Percheman, 7 Pet. 51, 8 L. Ed. 604. When a treaty admits of two constructions, one restrictive of the rights that may be claimed under it, and the other liberal, the latter is to be preferred. Shanks v. Dupont, 3 Pet. 242, 7 L. Ed. 666; Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628. Treaties may be construed on the principle of instruments in pari materia. Shanks v. Dupont, 3 Pet. 255, 7 L. Ed. 666. And it would seem a proper application of this principle to look into the legislation of the high contracting parties upon the subject, as well as to look to what view the executive branches of the government have taken, for, if they have already interpreted, courts will not set up to the contrary. Foster v. Neilson, 2 Pet. 253, 7 L. Ed. 415.

That treaties should be interpreted, in case of doubt, according to the tendency of international law, commends itself as a reasonable legal proposition.

Therefore, looking at the laws of the governments parties to the treaty, not because they control in respect to the matter before us, but as a guide only to the spirit and meaning of the treaty under consideration, we find the following provision in the United States Revised Statutes (section 1709):

"Sec. 1709. It shall be the duty of consuls and vice-consuls, where the laws of the country permit:

"First. To take possession of the personal estate left by any citizen of the United States, other than seamen belonging, to any vessel, who shall die within their consulate, leaving there no legal representatives, partner in trade, or trustee by him appointed to take care of his effects.

"Second. To inventory the same with the assistance of two merchants of the United States, or, for want of them, of any others at their choice.

"Third. To collect the debts due the deceased in the country where he died, and pay the debts due from his estate which he shall have there contracted.

"Fourth. To sell at auction, after reasonable public notice, such part of the estate as shall be of a perishable nature, and such further part, if any,

as shall be necessary for the payment of his debts, and, at the expiration of one year from his decease, the residue.

"Fifth. To transmit the balance of the estate to the treasury of the United States, to be holden in trust for the legal claimant; except that if at any time before such transmission the legal representative of the deceased shall appear and demand his effects in their hands they shall deliver them up, being paid their fees, and shall cease their proceedings."

And in the laws of the kingdom of Italy relating to the functions and attributes of consuls, this provision:

"Art. 25. In the event of the death of an Italian, the consuls can execute all and any kind of deeds of protection, release, or administration in the interests of the deceased or his estate."

In Wheat. Int. Law, p. 175, the principle is laid down:

"The consuls have authority and power to administer on the estates of their fellow-subjects deceased within their territorial consulate."

In the matter of Parsons, deceased, Secretary of State Marcy, in 1855, writing officially to Mr. Aspinwall, consul general at London, says:

"The consuls of the United States are authorized and requested to act as administrators on the estates of all citizens of the United States dying intestate in foreign countries, and leaving no legal representative or partner in trade. Indeed, this is one of the most sacred and responsible trusts imposed by their office, and in this respect they directly represent their government in protecting the rights and interests of the representatives of deceased citizens. The consul of the United States, therefore, was the only person who could legally touch the property left by the deceased, Parsons; it was his duty to deposit the proceeds thereof in the treasury of the United States, there to await the decision of the proper authorities as to its final disposition." Whart. Law Dig. 782.

In the matter of Chadwick, deceased, arising in 1875, Mr. Cadwalader, acting secretary of state, representing his government, writes:

"In the case of American citizens dying abroad, it is made by law the duty of the United States consul within whose jurisdiction such death occurs to take charge of the effects of the deceased, cause an inventory of such effects to be taken, and dispose of any that may be deemed perishable by sale at public auction, and the proceeds of which, together with all other property and moneys of the deceased, he is to hold subject to the demand of the legal representatives of the deceased. In case such representatives do not appear and demand the estate within a year, the consul is required to transmit the effects to the treasury department, there to await final distribution to the parties entitled to receive them."

And again the same distinguished lawyer, writing officially, says:

"When a citizen of the United States, not a seaman, dies abroad without leaving a will, it is made the duty of a consul to take charge of any property he may leave in the consular district, and, after paying the debts of the deceased contracted there, to send the proceeds of the property at the expiration of a year to the treasury of the United States, there to be held in trust for the legal representative. In case, however, a legal representative shall appear and demand the effects, the consul is required to deliver the property to him, after deducting the lawful fees. The statute on this subject may be found in section 1709 of the Revised Statutes of the United States."

Cushing, attorney general in 1856, held that consuls under the United States law, in the absence of treaty authority, could not intervene as of right in the administration of a decedent's estate except by way of surveillance. 8 Op. Atty. Gen. 98; Whart. Law Dig. 784, 785.

Attorney General Black in 1859 held that the United States was not bound by treaty with Peru to pay a consul of that country, the value of property, belonging to a deceased Peruvian, which the consul was entitled to administer, but which had been unjustly detained and administered by a local public administrator, and that the remedy of the consul was in the courts. 9 Op. Atty. Gen. 383.

While United States statutes are to be considered in arriving at the spirit and intention of a treaty, I apprehend that state statutes are not so entitled. State legislatures are only remotely connected with the treaty-making power, and their right to negotiate treaties is expressly prohibited by the federal constitution.

"All treaties made, or which shall be made under the authority of the United States shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." Const. art. 6, § 3.

This plain language compels the elimination of all consideration of state laws while in the business of construing a treaty. State law must yield, and adjust itself to the spirit and intent of a treaty. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; Hauenstein v. Lynham, 100 U. S. 483, 25 L. Ed. 628; In re Parrott (C. C.) 1 Fed. 481. Federal laws and treaties must be read together, and reconciled if possible. Chew Heong v. U. S., 112 U. S. 536, 5 Sup. Ct. 255, 28 L. Ed. 770; Taylor v. Morton, 2 Curt. 454-457, Fed. Cas. No. 13,799; Ropes v. Clinch, 8 Blatchf. 309, Fed. Cas. No. 12,041. It in no sense follows that treaties and state statutes are to be reconciled. If that were attempted, there might have to be as many reconcilements as there are states in the Union. I find no federal authority wherein the possibility that the exercise of privileges or prerogatives under a treaty might interfere with the provisions of state statutes or practice has been even discussed. And other than the Louisiana case cited by Surrogate Thomas, and another Louisiana case to which I shall later refer, I find no state authorities. On the contrary, I find that the United States was compelled to pay the loss awarded by international arbitrators where the surrogate of New York county, in violation of the treaty with Peru, failed to award administration to the Peruvian consul, but gave it instead to the public administrator. In re Vergil, 4 Moore inter Arb. 390. The Peruvian treaty provided:

"That in the absence of the legal heirs or representatives, the consuls, or vice-consuls of either party shall be ex officio the executors or administrators of the citizens of their nation who may die within their consular jurisdiction." 10 Stat. 945, art. 39.

I quote from the unanimous decision of the four arbitrators:

"In the month of May, 1857, the Peruvian citizen Jean del Carmen Vergil, returning from New York to the Pacific, died on board the steamer Empire

City. The agents of the company to which that steamer belonged placed his personal effects in the hands of the 'public administrator of the city of New York.' The minister of Peru in the United States, in July of the same year, represented to the secretary of state that the Peruvian consul in the same city had made proper representation to entitle him to the charge of these effects under existing treaty stipulations, but that, failing to secure the rights therein guarantied to him, it was necessary to interpose diplomatic offices. The secretary of state immediately instructed the law officer of the government of the United States in the city of New York 'to take such steps as would secure compliance with the provisions of the treaty.' The conflicting claims of the public administrator and of the consul of Peru appear to have been heard before the surrogate's court of New York, at different times, up to the 2d of December, 1858, after which no record is found of further judicial investigation, although it continued to be the subject of diplomatic correspondence up to December, 1862. When the attention of the secretary of state [Mr. Cass] was first invited to this case, no objection was presented to the views expressed by Mr. Osma in reference to the Peruvian consul's right to take possession of Vergil's property under the treaty of 26th July, 1851; so far from it, it will have been observed, that prompt measures were taken to secure the observance of the stipulations of the thirty-ninth article of that treaty. When it had become evident that the proceedings were unsuccessful, the question was referred to the attorney general of the United States 'for his opinion as to the requisite measures to be pursued, in order to give effect to the stipulations of the treaty.' That officer declared that the detaining of the goods of the deceased from the Peruvian consul was unlawful, and a wrong which may justly be complained of. He thought, however, that the Peruvian consul and minister were in fault in endeavoring to obtain 'redress where there is no authority to furnish it,' and he added that the judicial authorities would have given them this justice 'for the asking.' Dismissing any further question upon the principles involved in this claim, in regard to where there is no disagreement among the commissioners, it remains only to arrive at a just measure of the value of Vergil's effects as they were delivered to the public administrator, and claimed by the consul of Peru."

While the forms of expression in the numerous treaties of the United States widely differ, nevertheless governments in their negotiations acted according to well-defined principles, and had in view specific objects, and, although the language varies in the different treaties, the privileges and prerogatives given and obtained in respect to the same subject are in furtherance of the same common principle and object. So, where provisions are found in one treaty of doubtful import, we are entitled to look to the provisions of treaties with other nations, on the same subject, which are free from doubt, or which, having been construed, will aid us in determining the true spirit and meaning of that which is in doubt. It is true that in Aspinwall v. Queen's Proctor, 2 Curt. Ecc. 241, decided in 1839, the English prerogative court held contrary to the view of international law for which I contend. This case was decided at a period when that clause of the treaty between England and Spain which gave to their respective consuls the right to administer upon the estates of their country's subjects was being freely violated by both parties. It was also before the policy of the nations in respect to the authority of consuls had taken form so as to become a necessary part of the reciprocal relations between nations, and parliament had not by act at this time adopted a policy, as had the United States. The position taken by the English judge was in direct conflict with the opinion of Secretary

Marcy above referred to, and I believe in conflict with the present interpretation of international law by all continental Europe. In this country I find but one published authority, other than that of Surrogate Thomas, agreeing with the English view, and that is the case of Lanfear v. Ritchie, 9 La. Ann. 96, in which case the court, in an opinion of but a few lines, asserts the sovereignty of the state, and denies the right of federal authorities to interfere in probate matters. This case as an authority suffered severely in the early sixties, and it seems now of more than doubtful authority, since the decision of the supreme court of Louisiana in Succession of Rabasse, 47 La. Ann. 1454, 17 South. 867, 49 Am. St. Rep. 433, decided in June, 1895, reversing the civil district court (the court of probate), and holding that the provisions of the treaty with Belgium, the stipulations of which were applicable to·France, giving the consul the right to appear personally, or by delegate, in all proceedings, in behalf of absent or minor heirs, repealed the authority given by law to the probate judge to appoint counsel or guardian ad litem to absent heirs. In this case there was a will and an executor, and the right to administer did not arise. Judge Ellis of the civil district court, whose decision was reversed, took much the same view as is taken by the surrogate in the Logiorato Case upon the subject of state authority. He said referring to the treaty provision:

"I do not understand that its object or its effect was or is to strike down the authority or jurisdiction of the local probate tribunal, and to substitute therefor, in the contingency named, the power and authority of a resident consul to be by him exercised personally, or by a selected delegate. In this succession, during the progress of its settlement, should the consul of France or his delegate find it necessary to appear in behalf of absent or minor heirs domiciled in France, the treaty stipulation, which confers judicial standing quoad hoc on the consul or his delegate, would be respected within the limits of the contingencies named in said treaty; but, as a probate judge holding my authority from a sovereign state of the Union, I do not recognize the right or power of the consul, either to take charge·of the administration personally, or by delegate, nor his right to indicate what member of the bar I shall appoint to represent the absent heirs of the deceased. The property of the succession is all here; the deceased lived and died domiciled here. There may be domestic creditors, or domestic heirs legal or instituted. Our state laws provide fully for the protection of the interests of nonresident parties, and the succession is in the hands of a dative testamentary executor. I hardly deem it worth while to refer to the constitutional right of the government of the United States to regulate probate matters, or the settlement of succession in the several states of the Union. There can be, under our system of federal government, no such things as federal probate jurisdiction within any of the states, i. e., outside of the District of Columbia and the several territories. The probate jurisdiction was not conferred by the people, in their constitution, upon the general government, and ergo it was reserved by the states and the people thereof respectively. It would not be in the power of the general government to withdraw this authority from the states, or any of them, by means of a treaty with a foreign government, and therefore to construe the 15th article of said treaty (16 Stat. 763) as is here contended by the representative of the consul of France would be to announce its indirect nullity because notative of our federal constitution. I do not so construe it; it is a useful and beneficial provision, and will be respected in its letter and spirit whenever the occasion arises to which it has application. I do not assume, nor can I, that it has ever been the intention

of the high contracting powers to said treaty that the consuls of either should have any other powers quoad the matters referred to in said article 15 than those of full capacity to appear, and obtain from the local probate courts the necessary processes for the provisional care, protection, and preservation of the minor heirs, or property of their countrymen dying abroad under the conditions stated in said article."

The supreme court of Louisiana in reversing the civil district court say:

"If the treaty is susceptible of the construction of the appellant, the result will be to avoid the appointment of an attorney for the absent heirs, and require the recognition of the appellant as the delegate of the French consul. In our view, the stipulation in this treaty puts the delegate in the position of an agent of the French heirs, with the same effect as if he held their mandate to represent them as heirs. That was the manifest purpose, and the language of the treaty plainly expresses that intention. There is no power to appoint an attorney for absent heirs when the heirs are present and . represented. * * * It is idle to call in question the competency of the treaty-making power, nor do we think any question can be raised that the subject of this treaty under discussion here is properly within the scope of the power. That subject is the right of French subjects to be represented here by the consul of their country. On that subject the treaty provision is plain. The treaty by the organic law is the supreme law of the land, binding all courts, state and federal. * * * The treaty discloses no purpose to require our courts to appoint, as the attorney for absent heirs, the delegate of the French consul. Its purpose is accomplished by placing the delegate before the court as representing the absent heirs, and precluding the appointment of any attorney to represent them."

Having discussed the principles of the interpretation and construction of treaties at some length, let us look at the particular language before us. Consuls are given the right to intervene "in the possession." We must give this form of expression some weight and some effect. It would seem that the only intelligent construction would be that the consul had the right to come between the property and the possession by some one else than himself, with the result that possession must necessarily be landed in him. To intervene in the administration is secondary; he first comes into possession, and then he comes between the administration and the person who might have a right thereto under state law. This is giving to the word "intervene" its ordinary definition, and avoiding its local legal significance. Endeavoring to ascertain the spirit and intention of the language "to intervene in the possession, administration and judicial liquidation of the estate of the deceased," we must have regard for the entire context, and we may not select a single word for definition. It must not be viewed, as would a New York statute, from our own local standpoint. It must be borne in mind that there can be but one correct construction of a contract; therefore, as we construe, so must the authorities of Italy; consequently, we must view it from the Italian, as well as our own, standpoint, and from both see what was intended to be accomplished by the use of the words quoted. This can be done in no better way than by studying the policy of Italian law on the subject, and at the same time realizing that the estates of foreign subjects are to be distributed according to the law of their own country,

and not ours, and in such distribution the consul is more competent to execute the laws of his country, of which he must be presumed to have particular knowledge, while our courts, on the contrary, are not presumed to be learned in foreign laws, and cannot take judicial notice of them. If the words, "conformably with the laws of the country for the benefit of the creditors and legal heirs," relate to rights, and not to procedure, then the estate of a foreign subject would have to be distributed in accordance with our state statutes of distribution. This certainly could not have been the intention of the contracting powers. They could not have intended to take from their own subjects the rights which they would have enjoyed had their intestate died at home, and to permit them to share according to a foreign statute of distribution. The right that is given by the treaty is the possession and paramount right of administration, and this is not limited by the words "conformably with the laws of the country for the benefit of the creditors and legal heirs." These latter words provide merely for the procedure. The consul, having been given the right of possession, is then required to administer the estate in conformity with the local laws in reference to such matters. This interpretation gives full protection to the domestic creditors, and that is all that the policy of the state law demands. The desire of state courts is to protect resident creditors, and after that is done they have no further concern except to deliver the property into the hands of the officers of the state to which it properly belongs. There is no principle known to American law requiring our courts to protect foreign subjects against the claims of duly accredited representatives of their own government.

I am satisfied that, both under a fair interpretation of the treaty provisions as well as under the general law of nations as recognized by the United States, the Italian consul is entitled to the possession, for the purposes of administration, of the property of all Italian subjects dying intestate within his consular jurisdiction. Decreed accordingly.