[Sac. No. 1669. In Bank.—April 5, 1910.]

In the Matter of the Estate of GIUSEPPE GHIO, Deceased. SALVATORE L. ROCCA, Consul General of Kingdom of Italy, Appellant, v. GEORGE F. THOMPSON, Public Administrator, Respondent.

ESTATES OF DECEASED PERSONS—APPOINTMENT OF PUBLIC ADMINISTRA-TOR—SUBJECTS OF ITALY—TREATY RIGHTS OF CONSUL GENERAL.— Where a subject of Italy, residing in San Joaquin County, died therein, leaving estate therein, the public administrator of that county was properly appointed administrator of such estate, notwith-standing all of the heirs are subjects of Italy, in preference to the consul general of the kingdom of Italy for the state of California. The latter has no right of administration under the treaty of the United States with the kingdom of Italy, in such case, which can supersede the rights conferred upon the public administrator by the laws of this state.

ID.—POWER TO CONTROL ESTATES BY TREATY—PRESUMPTION.—Assuming that under the constitution of the United States, the treaty-making power of the federal government may control by treaty the power of the states to control and limit the right of administration of estates, and the power of the state courts to appoint administrators, so far as the resident citizens of foreign countries are concerned, yet such intent is not to be lightly imputed to the federal government, and it cannot be allowed to exist, except where the language used in a treaty plainly expresses it or necessarily implies it.

ID.—TREATY WITH ITALY—"MOST FAVORED NATION"—TREATY WITH ARGENTINE REPUBLIC—RIGHT OF ADMINISTRATION NOT CONFERRED.— Under the treaty with Italy conferring upon its consuls general the rights of the "most favored nation," it cannot be claimed that the treaty with the Argentine Republic as a favored nation, conferring upon its consul general the right "to intervene in the possession, administration, and judicial liquidation of the estate of the deceased, conformably with the laws of the country," confers upon it the right of administration of an estate of a deceased subject of that govern-ment who died in this state leaving property therein, to the exclusion of the public administrator.

ID.—CONSTRUCTION OF ARGENTINE TREATY—"CONFORMABLY WITH THE LAWS OF THE COUNTRY"—LAWS OF STATES.—The words of the Ar-gentine treaty "conformably with the laws of the country," in view of the well-known complex system of our government, imports in the use of the phrase "laws of the country," so far as the United States are concerned, the local laws of administration and procedure of the respective states. If the right asserted is necessarily contrary to those laws it cannot be conformable with them. Under the laws of

this state, if there be no next of kin of a deceased person, the public administrator shall administer the estate, which excludes the consul general as an administrator.

Id.—Right to "Intervene."—Whether the matter in hand is the "possession," the "administration," or the "judicial liquidation of the estate," the Argentine treaty secures to the consul general only the right to "intervene" therein. The word "intervene" is here used with reference to a proceeding in a judicial tribunal, and imports "the admission by leave of court of a person not a legal party to pending legal proceedings, by which such person becomes a party thereto for the protection of some right or interest alleged by him to be affected by such proceedings." The clause in the Argentine treaty relates to legal proceedings for the settlement of estates, and the word "intervene" should be given the usual meaning in that connection.

Id.—Intervention Known to "Civil Law."—In the civil law an intervention was "the act by which a third party becomes a party in a suit pending between other persons." That "intervention" was known to the civil law appears by the fact that our own code definition of an intervention, and that of many other states, is taken from the code of Louisiana, whose system was derived from the civil law.

Id.—Argentine Republic Modeled on United States.—The Argentine Republic is modeled upon the constitution of the United States, having a federal and local form of government, and it is not to be presumed that the words used in its treaty with the United States were intended to supplant the laws of the several states, or to confer a right to "intervene" upon its consul general in the settlement of estates in any other than the legal sense of that term, and not as imputing that the consul general can supersede the public administrator in the settlement of any estate.

Id.—General Construction of Treaties—Usual Import of Terms.—Treaties are subject to the same rules of interpretation as other documents, and words employed therein are to be given the meaning they usually have when used in that connection. The right to "intervene" in the settlement of an estate or in a legal proceeding in the nature of a proceeding *in rem*, is not usually understood to include the right to take the property from the custody of the court or from the officer upon whom the laws of the country impose the duty of administering and distributing it.

Id.—Object and Purpose of Argentine Treaty.—The object and purpose of the Argentine treaty would be fully met by allowing the foreign consul to represent the citizens of his country who are interested as heirs or creditors, in case they are not present or otherwise represented, giving him the right to appear in court for them, either officially or in their names, to protect their interests, and requiring him to be served with notice to them when notice is required. The use of the word "intervene" implies an intention to give a right to the consul to appear in a pending administration or action carried

on by another person, and not a right to carry on the proceeding himself, unless the public administrator declines to be appointed.

APPEAL from an order of the Superior Court of San Joaquin County granting letters of administration to the public administrator. Frank H. Smith, Judge.

·The facts are stated in the opinion of the court.

Ambrose Gherini, Clary & Loutitt, and R. K. Barrows, for Appellant.

John E. Budd, and Budd & Thompson, for Respondent. Cullinan & Hickey, and John J. O'Toole, *Amici Curiæ*, for Respondent.

SHAW, J.—Salvatore L. Rocca appeals from an order of the superior court granting to George F. Thompson, as public administrator of San Joaquin County, letters of administration upon the estate of Giuseppe Ghio, deceased, and refusing the application of said appellant for such letters.

The appeal was submitted to the district court of appeal of the third district and decided in favor of the respondent. A rehearing in the supreme court was ordered, because, as treaty rights were involved, it was deemed advisable that the highest state court should consider the matter.

Giuseppe Ghio, at the time of his death, was a resident of San Joaquin County, California, and a citizen of the kingdom of Italy. He left a small estate situated in San Joaquin County. His heirs at law are his wife, Maria, and three minor children. All of them reside in Italy. The appellant is the consul general of the kingdom of Italy for California, Nevada, Washington, and Alaska Territory. The deceased died intestate on April 27, 1908, in San Joaquin County.

The sole question for consideration is whether or not where a citizen of Italy, being a resident of California, dies intestate, leaving property in this state, and his lawful heirs all reside in Italy and are citizens of that country, the consul general of Italy is entitled to letters of administration upon his estate, in preference to the public administrator of the county of his residence.

The appellant bases his claim to such letters upon the provisions of the treaty of May 8, 1878, between Italy and the

United States. The clauses relating to this subject are articles XVI and XVII, which are as follows:—

"Article XVI. In case of the death of a citizen of the United States in Italy, or of an Italian citizen in the United States, who has no known heir, or testamentary executor designated by him, the competent local authorities shall give notice of the fact to the consul or consular agents of the nation to which the deceased belongs, to the end that information may be at once transmitted to the parties interested.

"Article XVII. The respective consuls general, consuls, vice consuls and consular agents, as likewise the consular chancellors, secretaries, clerks or attaches, shall enjoy in both countries, all the rights, prerogatives, immunities and privileges which are or may hereafter be granted to the officers of the same grade of the most favored nation." (20 U. S. Stats. at Large, p. 752.)

Under Article XVII the appellant, as consul general of Italy, claims the rights which are given to consuls general of the Argentine Republic by the treaty between that country and the United States, concluded July 27, 1853. (10 U. S. Stats. at Large, p. 1001.) The last clause of article IX of that treaty is as follows: "If any citizen of either of the two contracting parties shall die without will or testament, in any of the territories of the other, the consul general, or consul of the nation to which the deceased belonged, or the representative of such consul general or consul, shall have the right to intervene in the possession, administration, and judicial liquidation of the estate of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs." (P. 1009.)

Article VI of the constitution of the United States declares that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." And section 10 of article I further provides that "No State shall enter into any Treaty, Alliance, or Confederation." We will assume that the treaty-making power of the federal government is so far superior to the law-making power of

Congress that it would authorize the federal government to control by treaty the power of the states to confer and limit the right of administration of estates and the power of the state courts to appoint administrators, so far as the estates of resident citizens of foreign countries are concerned. (See, on this subject, note to *Yeaker* v. *Yeaker*, 81 Am. Dec. 536.) If this is the case, the treaty with the Argentine Republic, if construed in accordance with appellant's contention, supersedes, in part, the provisions of our Code of Civil Procedure of California, giving the right of administration of the estates of persons dying intestate to the public administrator, in the absence of resident legal heirs, and gives to the consular agents of that country a paramount right to letters upon the estates of citizens of that country residing here, who die intestate leaving real or personal property in this state and no resident heirs. The favored nation clause of the Italian treaty would give the like right to the appellant, as consul general of Italy, in the present case.

Similar favored nation clauses are found in the treaties with Austria-Hungary (treaty of 1870, art. 15, 17 U. S. Stats. 331); Denmark (treaty of 1826, art 8, 8 U. S. Stats. 342); Japan (treaty of 1894, art. 15, 29 U. S. Stats. 852); Kongo (treaty of 1891, art. 5, 27 U. S. Stats. 929); Korea (treaty of 1882, art. 2, 7 Fed. Stats. Ann. 680); Russia( treaty of 1832, art. 8, 8 U. S. Stats. 448); Spain (treaty of 1902, art. 28, 33 U. S. Stats. 2120); Switzerland (treaty of 1850, art. 7, 7 Fed. Stats. Ann. 842); Tonga (treaty of 1886, art. 11, 25 U. S. Stats. 1442); and Zanzibar (treaty of 1886, art. 2, 25 U. S. Stats. 1439).

Foreign consuls and consular agents are given the same "privileges" as those of the most favored nation by the treaties with Belgium (treaty of 1880, art. 2, 21 U. S. Stats. 777); Costa Rica (treaty of 1851, art. 10, 10 U. S. Stats. 922); France (treaty of 1853, art. 12, 10 U. S. Stats. 999); Germany (treaty of 1871, art. 3, 17 U. S. Stats. 922); Greece (treaty of 1902, art. 2, 33 U..S. Stats. 2123); Honduras (treaty of 1864, art. 10, 15 U. S. Stats. 705); Netherlands (treaty of 1878, art. 3, 21 U. S. Stats. 663); Paraguay (treaty of 1859, art. 12, 12 U. S. Stats. 1097); Persia (treaty of 1856, art. 7, 11 U. S. Stats. 710); Roumania (treaty of 1881, art. 2, 7 Fed. Stats. Ann. 773); and Servia (treaty of 1881, art. 2, 22 U. S. Stats.

968).   The treaty of 1903 with China gives Chinese consuls here the same "attributes, privileges and immunities" as those of the most favored nation. (Art. 2, 7 Fed. Stats. Ann. 487.) The consuls from the countries thus given the same "rights," "prerogatives" or "powers," being those embraced in the list first given, could doubtless claim the same rights as those of Italy, with respect to estates of citizens of their respective countries dying here.   Perhaps those included in the second list would claim the same right as a "privilege" within the intent of the respective treaties.   The treaty of 1887, with Peru, (25 U. S. Stats. 146), which terminated in 1899 by notification from Peru, provided that the consuls of each country, in the absence of heirs or representatives, should *ex officio* be the executors or administrators of the citizens of their country who died within their consular jurisdiction.

The question presented would directly affect the right of administration upon the estates of all citizens of all the above named countries residing in this state, of whom there is doubtless a large number.   It is also of grave importance because its solution in favor of the appellant necessarily ascribes to the federal government the intent, by means of its treaty-making power, to materially abridge the autonomy of the several states and to interfere with and direct the state tribunals in proceedings affecting private property within their jurisdictions.   It is obvious that such intent is not to be lightly imputed to the federal government, and that it cannot be allowed to exist except where the language used in a treaty plainly expresses it, or necessarily implies it.

So far as we are aware, the exact point has not been considered in any of the states except Massachusetts and New York. In New York it has arisen only in the surrogate courts of two of the counties, New York County and Westchester County. The surrogate court of the latter county held that the consul general of Italy was entitled to letters of administration upon the estate of a citizen of Italy who died leaving property in that county, in preference to the county treasurer, who, by the state law, was entitled as public administrator, in the absence of heirs and creditors.   (*In re Fattosini*, 33 Misc. 18, [67 N. Y. Supp. 1119].)   The same court, in a similar case, apparently decided that the Italian consul was entitled, by virtue of his office, to maintain a proceeding in the surrogate court,

before any grant of letters of administration, to obtain possession of the effects of the deceased, in order that the consul might administer the same under the direction and control of the court. It does not appear that letters had been granted to the consul. (*In re Lobrasciano's Estate*, 38 Misc. 415, [77 N. Y. Supp. 1040].) The surrogate court of New York County held, in a similar case, that, where the public administrator refused to act and the Italian consul was legally competent under the state law, he would be entitled to letters, under the statutory provision that when in such case the public administrator refused to act, any person legally competent might be appointed. But his right in preference to the public administrator was denied. (*In re Logiorato's Estate*, 34 Misc. 31, [69 N. Y. Supp. 507].) The Massachusetts supreme court decided that, under the most favored nation clause of the treaty with Russia and by referring to the treaty with the Argentine Republic, the Russian vice consul had a right to administer, paramount to that of the public administrator, in the case of a citizen of Russia who died in Massachusetts leaving personal property there, his legal heirs being in Russia. (*McEvoy* v. *Wyman*, 191 Mass. 276, [114 Am. St. Rep. 601, 77 N. E. 379].) In a Louisiana case, *Lanfear* v. *Ritchie*, 9 La. Ann. 96, the Swedish consul applied for an order that he supersede the duly appointed public administrator in the possession of the estate of a deceased citizen of Sweden, whose heirs were Swedish subjects residing in Sweden. The contention was that this was guaranteed by the treaty with Sweden. The treaty then in force did not contain any favored nation clause, nor purport to give to consuls in either country the right to administer the estates of its deceased citizens. The court denied his application on that ground, and also on the ground that a treaty could not control the state courts. In *Aspinwall* v. *Queen's Proctor*, 2 Curteis, 241, the English court held that the United States consul, as such, had no right under the act of Congress of 1792, to administer upon the estate of an American traveler who died while in England leaving property there. The court said that "the crown is the party to see that the property of any person dying in its dominions goes into proper hands" and that the law of the United States could not be allowed to control, even if it purported to do so.

We do not agree with the supreme court of Massachusetts

and the surrogate court of Westchester County, New York, in regard to the meaning and effect of the Argentine treaty. They held that the right given thereby "to intervene in the possession, administration and judicial liquidation of the estate of the deceased, conformably with the laws of the country," included the right to be appointed administrator of the estate in place of the person who might be designated by the laws of the particular state to be such administrator and who had either been previously duly appointed by the local state court, or was applying for such appointment. It appears clear. to us from this language that, whatever right was given, it was intended to be a right which should conform to the laws of the country, and that, in view of the well-known complex form of our government, the phrase "laws of the country," so far as the United States is concerned, means the local laws of administration and procedure of the respective states. If the right asserted is necessarily contrary to those laws, it cannot be said to conform to them. Our law declares that in the absence of next of kin entitled to inherit, the public administrator shall take charge of and administer the estate for the benefit of the creditors and heirs. The right claimed under the treaty is that, in such a case, the consul of the country of which the deceased was a citizen shall take charge and administer; a right directly in conflict with our law. The contention of the appellant is that the only effect of the phrase "conformably with the laws of the country" is that the consul, when appointed, must administer the estate in compliance with the local law of administration. The more obvious interpretation is that the phrase qualifies the right and the method of intervention, as well as the procedure after intervention takes place, that is, that if the consul intervenes, he must do so in the manner, to the extent, and for the purposes prescribed and allowed by the laws of the local jurisdiction in which the property is situated. This is the grammatical effect of the qualifying clause.

Whether the matter in hand is the possession, the administration, or the judicial liquidation of the estate, the treaty secures to the consul only the right to "intervene" therein. The word "intervene" is here used with reference to a proceeding in a judicial tribunal. In that connection the word has a settled meaning. The dictionaries declare that when applied to matters of law it means: "To interpose in a lawsuit so as to

become a party to it." (Cent. Dic.; Stand. Dic.) Bouvier defines "intervention" at common law thus: "The admission, by leave of court, of a person not an original party to pending legal proceedings, by which such person becomes a party thereto for the protection of some right or interest alleged by him to be affected by such proceedings." And in the civil law as "The act by which a third party becomes a party in a suit pending between other persons," citing Pothier Proces Civiles, 1ère part, ch. 2, S. 6, 3. (1 Bouv. Dic. Rawles ed. 1114.) A similar definition is given in our Code of Civil Procedure. (Sec. 387.)

Appellants say that the word should be construed according to its literal meaning, "to come between," and that "to come between," in the possession and administration of an estate, means to have a preferred right to act as administrator, if it refers to a time before the appointment is made, or to supersede any other appointee, if used in reference to any subsequent time. This claim is based on the assertion that an intervention was unknown in the civil law, from which it is supposed the Argentine Republic takes its system of legal procedure, and also upon the principle that in construing treaties words are to be given their popular rather than their legal signification.

The constitution of the Argentine Republic was adopted on May 25, 1853. It was avowedly modeled upon the constitution of the United States, which it closely follows, both in general plan and in specific provisions. Its government is federal in form, with "provinces" which correspond to our states, each having power to make its own local laws subject, however, to the civil, criminal, commercial, and mineral codes when such should be enacted by the national congress. (9 Argentine const., arts. 105, 108 and 67, [10], Senate Exec. Doc.) The treaty with this country was made in July, 1853. At that time the public men of that country must have been very familiar with the form of government of the United States and with the fact that it committed local affairs to the several states. It is not probable, therefore, that the words of the treaty under consideration were chosen with the intent to have the international agreement become a part of, and in part supplant, the laws of the states of the United States, or of the provinces of Argentina, in matters committed solely to the

states or provinces. The assertion that an intervention, as our law defines it, was not known in civil-law countries is shown to be without foundation by the foregoing citation of Bouvier to Pothier, and also by the fact that our own code definition of an intervention, and that of many of the other states, is taken from the code of Louisiana. (*Horn* v. *Volcano W. Co.*, 13 Cal. 69, [73 Am. Dec. 569].) The procedure and jurisprudence of that state, as is well known, was derived from the Code Napoleon and from the system in use in the early Spanish American colonies, both of which are adaptations of the civil law. Justice Field said in *De Geofroy* v. *Riggs*, 133 U. S. 271, [10 Sup. Ct. 295], with regard to the construction of treaties: "As they are contracts between independent nations, in their construction words are to be taken in their ordinary meaning as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended. And it has been held by this court that where a treaty admits of two constructions, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred." Appellant quotes this canon of construction as decisive of the sense in which the word "intervene" is to be understood. The court in that case held that the phrase "in all the states of the Union," in the clause of the treaty with France giving citizens of France the right to inherit the property of citizens of the United States, included the district of Columbia. The subject in hand and the context indicated that the phrase was used in the most comprehensive sense, to include the entire country, and the court could not reasonably have held otherwise. But treaties are subject to the same rules of interpretation as other documents. The clause of the Argentine treaty relates to legal proceedings for the settlement of estates and the words used are to be given the meaning they usually have in the respective countries, when used in that connection. The right to intervene in a legal proceeding partaking of the nature of a proceeding *in rem* is not usually understood in either country to include the right to take the property from the custody of the court, or from the officer upon whom the laws of the country impose the duty of administering and distributing it. The object and purpose of the treaty would be fully met by allowing the foreign consul

to represent the citizens of his country who are interested as heirs or creditors in case they are not present or otherwise represented, giving him the right to appear in court for them, either officially, or in their name, to protect their interests, and requiring that he be served with notices to them, when notice is required. The use of the word "intervene" implies an intention to give a right to the consul to appear as a party in a pending administration or action carried on by another person, and not a right to institute and carry on the proceeding himself. He has, in addition, a duty pertaining to his office imposed upon him by his own government, that of seeing to the safe keeping and proper disposition of the effects of citizens of his country who may die while traveling, or while temporarily present in the country to which he is accredited, or even while residing therein, and for that purpose, in the absence of any other representative of the deceased having a better right, he may "intervene in the possession" of the estate, conformably with the laws of the country. The custom of nations would permit this and it may be that, if the public administrator refuses or fails to apply, the consul may petition for and receive letters to himself as the official agent for the persons interested. But the treaty is not to be understood as giving him such right in preference to those upon whom it is devolved by the laws of the country when they are present and ready to accept its possession and discharge their duty concerning it. The theory of respondent is, in our opinion, in harmony with the spirit and purpose of the treaty and is in accord with the obvious meaning of the language used.

The order appealed from is affirmed.

Angellotti, J., Lorigan, J., Henshaw, J., and Melvin, J., concurred.