# GEORGE J. CHRYSSIKOS

## *vs.*

# VINCENT J. DEMARCO, Administrator of Nick Valmus.

*Administration: notice; non-residents out of State. Right of foreign consuls. Foreign treaties effect of—on courts.*

A non-resident who is out of the State is not entitled to notice of application for grant of administration.                p. 537

Where letters of administration have been granted on the estate of a decedent who is not a citizen of the United States, and said grant was made prior to the application of a non-resident claiming as the person first entitled thereto, said grant of administration will not be revoked in the absence of fraud or mistake, at the instance of a non-resident claimant.        p. 537

Where a consul of a foreign power claims to be the person first entitled to administration on the estate of a decedent not a citizen of the United States, his application must be made prior to any grant of letters on such estate by the Orphans' Court of this State, and such right as may be deducible from treaties can only be rightfully claimed in so far as the laws of each country will permit.                        pp. 543-544

The right of a consul of a foreign nation to receive and care for the personal estate of a citizen of his own country who may die within his consulate does not include the right of administration of such estate.                        p. 540

Treaties are binding on courts as the supreme law of the land, but courts are not required to give them strained construction or unreasonable interpretation, so as to secure to foreigners privileges denied citizens of this country.                p. 535

*Decided June 24th, 1919.*

Appeal from the Orphans' Court of Baltimore City.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*E. H. Young* and *Michael Miller,* for the appellant.

*John L. Sanford,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of Baltimore City which dismissed a petition of George J. Chryssikos, a representative of the Consulate of Greece at New York, which asks the Court to revoke, vacate and set aside letters of administration which had been granted Vincent J. Demarco on the estate of Nick Valmus, deceased, and to appoint him in the place of said Demarco. The petition alleges that Nick Valmus was a citizen of the Kingdom of Greece and died on the first day of May, 1918, in the City of Baltimore, where he resided, leaving surviving him as his only heirs or next of kin certain persons therein set out; that he left $1,800 in the Savings Bank of Baltimore and other sums on deposit in the City Savings Bank at Savannah, Ga. It is alleged that an application for letters of administration upon the estate of Nick Valmus was made by Vincent Demarco, attorney at law, of Baltimore, and letters were issued to him on June 1, 1918; that Demarco is not a relative of the deceased and his surviving brother living in this country has not reached the age of twenty-one years; that deceased was not a citizen of the United States but a citizen of Greece, and left surviving him parents, sisters and a brother in Gre ce. It is further alleged that the Consul-General, repre-

senting the Kingdom of Greece, and in pursuance of the treaty existing between the United States and Greece, is entitled to letters of administration and is by said treaty given the right prior to relatives of the deceased.

With the petition there was filed a paper-writing in which Constantine Panagopoulos, Consul-General of the Kingdom of Greece at New York, certified that George J. Chryssikos is the duly appointed and acting representative of the Consulate of Greece at New York and he nominated and directed him to make application to the Orphans' Court of Baltimore City for letters of administration upon the estate of Nick Valmus and to qualify as administrator. That is dated the 29th of July, 1918. An answer was filed September 3rd, 1918, which denied the right of the petitioner and of the Consul-General to relief under the petition, and alleged that it was bad in substance and not sufficient in form, etc.

There can, of course, be no question about the obligation of State courts to obey and respect treaties made under the authority of the United States, as the constitution and the laws of the United States made in pursuance thereof and all treaties made under the authority of the United States are the supreme law of the land; "and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding." Article 6, Con. of U. S. Article 2 of the Declaration of Rights of this State is to the same effect, and for the most part in the same language. When then the rights of a party under a treaty are alleged to be involved, it behooves a Court to give such a case its most thorough investigation and consideration, so that such rights as he has will be fully protected, and possible international controveries be avoided. We are not required, however, to give a strained construction to the language of a treaty, or place an unreasonable interpretation upon it, for the purpose of securing to foreigners privileges which are denied citizens of this country. Before discussing the treaty relied on, we will refer to some of the provisions of our testamentary laws which relate to granting letters of administra-

tion on estates of deceased persons and determine the right to administer—at least where no such question as that here raised is involved.

Our testamentary laws contemplate prompt administration. "Whenever any person shall die intestate, leaving in this State personal estate, letters of administration may forthwith be granted by the Orphans' Court of the county wherein was the party's mansion house, or residence," etc. Sec. 14 of Art. 93. The provision in section 16 that "No such administration shall be granted until at least twenty days after the death of the supposed intestate, and at least seven days after application therefor" only applies "to cases where the intestacy is not notorious or has not been proved to the satisfaction of the Orphans' Court." *Williams* v. *Addison,* 93 Md. 41. If letters are granted within the twenty days, the mere fact that they were does not make them invalid, as the presumption would be that such dying intestate was notorious or was proven as required. *Jones* v. *Harbaugh,* 93 Md. 269. Sections 18-29 of Article 93 prescribe the order in which relations of an intestate are entitled to administer, and section 30 provides that if there be no relations administration shall be granted to the largest creditor applying for the same.

Sec. 31 is: "If there shall be neither husband, nor wife, nor child, nor grandchild, nor father, nor brother, nor sister, nor mother, or if those be incapable, or decline, or refuse to appear on proper summons or notice, or if other relations and creditors shall neglect to apply, administration may be granted at the discretion of the Court." Sec. 32 provides that "It shall not be necessary to give notice to a party entitled to administration if he be out of the State, nor shall it be necessary to summon or notify collateral relations more remote than brothers and sisters of the intestate, in order to exclude them from the administration; and no relations, except a widow, child, grandchild, father, brother, sister or mother shall be considered as entitled unless they shall apply for the same." In *Jones* v. *Harbaugh, supra,* Harbaugh was the only brother and nearest relative of the deceased, who had no

other relations who were entitled to letters unless they applied for them, and no creditor applied. Harbaugh was a non-resident of the State, and we held that he "was not entitled to notice as he was out of the State, and therefore if before he applied letters had been granted to the person next entitled he could not have had them revoked. *Ehlen* v. *Ehlen,* 64 Md. 360. There being no one who was entitled to letters unless he applied, 'administration may be granted at the discretion of the Court.' Art. 93, Sec. 31. So in the absence of fraud or mistake, the appellee could not have had the letters revoked, if he had applied on the ground that he was first entitled." Dr. Jones was a Coroner of Baltimore City, where the decedent was found dead, and he applied for letters and obtained them two days after Harbaugh's body was found—the circumstances required prompt action.

It is then clear from the statutes and our decisions that none of the relatives of Valmus who lived in Greece, or in this country outside of this State, would be entitled to have the letters revoked which were granted to the appellee, and it is equally clear that they were not entitled to notice. If the treaty relied on by the appellant required notice to be given to the Consul-General before the Orphans' Court could grant letters to the appellee, or if he is by reason of it in a position to demand that the letters be revoked, then it vests in him powers which are not only not granted to him by the testamentary laws of this State, but are denied to relatives and all others not claiming under the Consul-General.

Without now referring to other grounds relied on by the appellee as defenses to the petition, we will examine the treaty with Greece in order that we can determine what the rights of the appellant are under it in this matter. In the Consular Convention of 1903 between Greece and the United States, the following article appeared:

"Article XI. In the case of the death of any citizen of the United States in Greece, or of a Greek subject in the United States, without having any known heirs

or testamentary executors by him appointed, the competent local authorities shall give information of the circumstances to the consular officers of the nation to which the deceased belongs, in order that the necessary information may be immediately forwarded to the parties interested.

"In all that relates to the administration and settlement of estates, the consular officers of the high contracting parties shall have the same rights and privileges as those accorded in the United States of America and Greece, respectively, to the consular officers of the most favored nation."

The appellant by reason of "the most favored nation" clause relies on the Convention of 1911 between the United States and Sweden. The first paragraph of Art. 14 of that Convention is sufficiently like that in Art. 11 with Greece to make it unnecessary to repeat it. That is immediately followed by these two paragraphs:

"In the event of any citizen of either of the two contracting parties dying without will or testament, in the territory of the other contracting party, the consul-general, consul, vice-consul-general, or vice-consul of the nation to which the deceased may belong, or, in his absence, the representative of such consul-general, consul, vice-consul-general, or vice-consul, shall, so far as the laws of each country will permit, and pending the appointment of an administrator and until letters of administration have been granted, take charge of the property left by the deceased for the benefit of his lawful heirs and creditors, and, moreover, have the right to be appointed as administrator of such estate.

"It is understood that when, under the provisions of this article, any consul-general, consul, vice-consul-general, or vice-consul, or the representative of each or either, is acting as executor or administrator of the estate of one of his deceased nationals, said officer or his representative shall, in all matters connected with, relating to or growing out of the settlement of such

estates, be in such capacities as fully subject to the jurisdiction of the courts of the country wherein the estate is situated as if said officer or representative were a citizen of that country and possessed of no representative capacity whatsoever."

In view of the testamentary laws of this State, which we have referred to above, there would seem to be but little room for discussion, were it not for the concluding sentence in the first paragraph of the treaty with Sweden quoted above: "and, moreover, have the right to be appointed as administrator of such estate." It would not be just to *assume* that in making a treaty with a foreign country laws of the different States were intended to be repealed or ignored, in the absence of express language or clear implication showing such intent, especially such as testamentary laws, which are necessary and exist in every State, although they differ in some particulars. To permit a representative of a foreign government to set aside the provisions of testamentary laws, and take from the probate courts, orphans' courts, or by whatever name they be known, the power to determine who shall administer upon estates, when otherwise it would be in the discretion of the courts, would be conferring broad powers on him, and yet if the contention of the appellant is sustained that is what it amounts to. For if a Consul-General has paramount right to administer, and can require our courts to remove administrators appointed according to the laws of the State, and let someone he designates qualify, the Consul-General, or his representative, virtually makes the appointment, and not only that, but may do so when it suits his convenience, and not before. So, although courts are bound by treaties and must not place a construction on them which would alter, add to, take from or in any way change them, or be controlled by the mere inconvenience of the provisions, if clear and unambiguous, they can, in seeking to ascertain the meaning of provisions, which are not free from doubt, take into consideration

the results which would follow a construction urged upon them.

The decisions have not been uniform in considering the right to administer upon estates, in cases before the courts in connection with different treaties between the United States and other countries. The general rule is thus stated in 9 *R. C. L.* 158, par. 5: "The duty, and by comity the authority, of a consul to receive and care for the personal estate of a citizen of his own country who may die within his consulate, and to protect the estate from spoliation, is prescribed and recognized by all civilized nations; but this power of intervention does not carry with it the right of administration of such estates, for it is fairly well settled that he has no right, as a consular officer, apart from treaty provisions, local law, or usage, to administer on such estates, or, in the absence of judicial authorization, to aid, in his character as consul, any other person in so administering them." As we pointed out, "the most favored nation" clause in the treaty with Sweden is relied on, and the important question is whether the clause in the first paragraph in the part of that treaty quoted above, viz, "shall so far as the laws of each country will permit," applies to the last sentence of that paragraph, *i. e.,* "and, moreover, have the right to be appointed as administrator of such estate," or is only applicable to proceedings prior to administration.

Since the decision in *Rocco* v. *Thompson,* 223 U. S. 317, the differences between the authorities seem to turn entirely on the construction of that clause. That case went to the Supreme Court of the United States upon a writ of error from the Supreme Court of California, the case below being reported as *"In Re Estate of Ghio,"* 157 Cal. 552. Ghio, an Italian subject, died intestate in California, leaving a personal estate. His wife and children lived in Italy. Rocco, the Consul-General of Italy for California and some other States, and Thompson, the Public Administrator, each made application for letters of administration. The Supreme Court of California decided in favor of Thompson, and that was

affirmed by the Supreme Court of the United States. The Consul-General based his claim on the treaty between the United States and Italy, and contended that under "the most favored nation" clause he was entitled to administer by reason of the privileges conferred upon consuls of the Argentine Republic. Mr. Justice Day referred to a number of cases reported in the *New York Supplement* to *In Re Wyman,* 191 Mass. 276, and to *Carpigiani* v. *Hall,* 172 Ala. 287, 55 So. 248, Ann. Cas. 1913 D. 651, as expressing a different view from that reached by the U. S. Supreme Court, and said that they have followed the doctrine of the *Lobrasciano Case,* 77 N. Y. Supp. 1040, "without independent reasoning upon the parts of the courts adopting it." What the Supreme Court decided may be seen by reference to the Syllabus of that case, as reported in the *Lawyers' Edition,* where it is said: "The most favored nation clause in the Italian treaty of May 8th, 1878 (20 Stat. at L. 732), does not give an Italian Consul-General the right to administer the estate of an Italian citizen dying intestate in one of the United States, to the exclusion of the one authorized by the local law to administer the estate, because of the privilege conferred by the Argentine treaty of July 27th, 1853 (10 Stat. at L. 1009, Art. 9), upon the consular officers of the respective countries as to citizens dying intestate 'to intervene in the possession, administration, and judicial liquidation of the estates of the deceased, conformably with the laws of the country, for the benefit of the creditors and legal heirs,' since this provision, if applicable, can not be construed as intended to supersede the local law as to the administration of such estates." After referring to statutes of the United States in reference to consuls, a section of the Consular Regulations and a letter of Mr. Hay, Secretary of State, under date of February 3, 1900, quoted in *Moore's International Law Digest,* Vol. 5, p. 123, Mr. Justice Day said: "In this country the right to administer property left by a foreigner within the jurisdiction of a State is primarily permitted to State law. It seems to be so regulated in the State of California by giving the adminis-

tration of such property to the public administrator. There
is, of course, no Federal law of probate or of the administra-
tion of estates." He then, with his usual clearness and force,
examined the treaties, and the Supreme Court reached the
conclusion announced above.

The learned JUSTICE, after stating that when the treaty-
makers intended to commit the administration of estates of
citizens of one country dying in another exclusively to the
consul of the foreign nation, they would do so in unmistak-
able terms, added: "For instance, when that was the pur-
pose, as in the treaty made with Peru in 1887, it was de-
clared in Article 33 as follows"—that article being then set
out. But by reference to it, it will be seen that it was only
"until the conclusion of a consular convention, which the
high contracting parties agreed to form as soon as may be
mutually convenient." After the quotation of that part of the
treaty with Peru, the opinion proceeds, in a separate para-
graph: "And in the convention between the United States
and Sweden, proclaimed March 20, 1911, it is provided"—
then follows the quotation from the treaty with Sweden. He
did not repeat in terms what he had said of the Peru treaty,
but if that must be inferred from what he did say, he did
not suggest or intimate that the treaty with Peru or Sweden
had any binding effect on the case then before the Court, for
indeed we understand that the one with Peru had terminated
in November, 1899, and the one with Sweden had not been
made when the California case began in the lower courts.
The learned JUSTICE would not, therefore, have construed
the treaty with Sweden in a case in which it was in nowise
involved, and, of course, the other members of the Court were
not called upon to do so, and the Court can not be said to
have placed any construction upon it, but what was said was
by way of illustration simply. That treaty can, therefore, be
properly construed by us without danger of coming in con-
flict with a decision of that high tribunal, or lessening the
force and reasoning of the opinion on the question decided.

If the last sentence in the paragraph of the treaty with Sweden referred to was not qualified by the prior language, it might well be contended that it was the intention to give the Consul-General, or other persons named, the exclusive right to administer, but we can not believe that the treaty-makers would have inserted the clause, "so far as the laws of each country will permit," for the purpose of merely limiting the right to take charge of property left by the deceased, "pending the appointment of the administrator, and until letters have been granted," without intending that it was to be applicable to the right to be appointed administrator—especially if that right be exclusive. Such a right would very materially interfere with the laws of some of the States, including Maryland, and would be very inconvenient and sometimes occasion losses to estates of the subjects of the countries affected by such treaties, if a Consul-General, or other persons named, could demand that letters granted to others be revoked on the ground that he had the exclusive right to administer. If the Consul-General, or others named, had the exclusive right to administer, it was not necessary, at least in most cases, to give such persons the right to take charge of the estate pending the appointment of an administrator and until letters of administration are granted, for the same persons are mentioned in the one case as in the other, and instead of a Consul-General, or his representative, taking charge of the property temporarily, he could qualify at once as administrator.

But, in our opinion, by the proper construction of the article, the term "so far as the laws of each country will permit" applies to the last sentence as well as to the other. Who is to have the right to administer? In order to answer that we must go back to the former part of the paragraph, where we find "the Consul-General, Consul Vice-Consul-General, or Vice-Consul of the nation to which the deceased may belong, or, in his absence, the representative of such Consul-General, Consul, Vice-Consul-General or Vice-Consul, shall, *so far as the laws of each country will permit* (italics ours)

\* \* \* take charge of the property left by the deceased, for the benefit of his lawful heirs and creditors, and, moreover, have the right to be appointed as administrator of such estate." It can not be doubted that if what we have omitted from that quotation had been left out of the treaty, the expression "so far as the laws of each country will permit" would apply to both taking charge of the property and administering. It would be a strange and unauthorized construction to hold otherwise, and what we omitted can not change that construction. That language was inserted to enable the Consul-General, or other persons named, to take possession before he was appointed administrator, but only "so far as the laws of each country will permit," which is clearly as applicable to the last sentence as to the other. So far as we can be aided by punctuation, that supports our construction. If we go to the dictionaries for the meaning of "moreover," we find that in the *Standard* it is defined: "Beyond what has been said; further; besides; likewise." And the *International* gives, besides all of these: "In addition"; "furthermore"; and "also." Either of those definitions which may be selected shows that the last sentence is directly connected with what proceeds it, and as the subject (the Consul-General *et al.*) is the same for both verbs, with the qualifying expression following the subject, it would be unreasonable, and we might add ungrammatical, to apply it to one clause and not to the other.

In most of the cases we have found, or have been referred to, since the decision of *Rocco* v. *Thompson* the courts have reached the same conclusion we have, as to the meaning of the treaty with Sweden. In *Austrio-Hungarian Consul* v. *Westphal,* 120 Minn. 122, 139 N. W. 300, decided in 1912, the Court said that while grammatically it might be contended that the qualifying clause applied only to the first part, yet the presumption, so aptly referred to by JUSTICE SHAW, *In re Ghio,* 157 Cal. 552, 37 L. R. A. (N. S.) 549, 108 Pac. 516, "against any intention on the part of the Federal Government to invade, by treaty, the provisions of State laws, in a matter so inherently local" and in consideration of

the subject matter and the provisions of the whole article convinced the Court "that the right to appointment as administrator is conferred by such article upon the expressed condition that it can be claimed only 'so far as the laws of each country will permit.' "

In *Estate of D'Adamo,* 212 N. Y. 214, 106 N. E. 81, L. R. A. 1915 D. 373, decided in July, 1914, JUDGE CARDOZA delivered a learned and able opinion. Amongst other things he said: "Considering, first of all, the mere words of the treaty, aside from extrinsic tokens of the purpose of the contracting parties, we find no expression of an intent that the consul's right to be administrator shall be exclusive, or that it shall supersede prior rights conferred by local law. 'So far as the laws of each country will permit,' the consul shall have the right, until letters of administration are granted, to take charge of the property of the deceased for the benefit of lawful heirs and creditors. Plainly this right is subordinate to the authority of the States. But the words 'so far as the laws of each country will permit' may fairly be construed as qualifying the whole sentence. The consul is not merely to have the right of temporary intervention, he is to have 'moreover' the right, in case of need, to be appointed administrator. But both rights—the right of temporary intervention and the right of permanent administration granted in addition are to be exercised only 'so far as the laws of each country will permit.' "

The Court then pointed out the strange consequences that would follow any other construction, and held that the treaty with Sweden did not give an exclusive right to the Consul-General, or other persons named, to administer.

In *Estate of Servas,* 169 Cal. 240, 146 Pac. 651, Ann. Cas. 1916 D. 233, decided in 1915, it was held that the expression applies not only to the temporary possession which the foreign consul may take of the property, but qualifies his right to be appointed administrator. In the note to that case in the Ann. Cas., *supra,* it is said: "The trend of recent

authority seems to be that the words 'so far as the laws of each country will permit,' in the treaty with Sweden heretofore referred to, exclude any intention of superseding State statutes and that no paramount or exclusive right of administration is conferred on consular representatives by that treaty." In *Pagano* v. *Cerri*, 93 Ohio St. 345, decided in 1916, the same construction of that treaty was adopted in a full and able opinion. That case has been followed in several later cases in the Supreme Court of Ohio.

None of those cited by the appellant can be regarded as satisfactory authorities to the contrary of the views we have expressed. In *Re Sinovcic's Estate*, 80 N. J. Eq. 260, 86 At. 917, the Court held that the administrator who had been appointed was illegally appointed under the laws of New Jersey and hence he could be removed, but the construction placed on the Argentine Republic treaty was not in accord with *Rocco* v. *Thompson*. The cases of *In re Wyman*, 191 Mass. 276, 77 N. E. 379, and *Carpigiani* v. *Hall*, 172 Ala. 287, 55 So. 248, Ann. Cas. 1913 D. 651, are disapproved in *Rocco* v. *Thompson*. In the *Alabama case*, the Court said that the decision *In re Ghio*, 157 Cal. 552, "must be regarded as erroneous," but the Supreme Court in *Rocco* v. *Thompson* affirmed it. There is a note in Ann. Cases (1913 D. 655) in which a number of cases reported in the N. Y. Supp., also *In re Wyman, supra*, and one in the lower Court of Ohio are referred to as in accord with the *Alabama case*, but the Annotator adds: "The foregoing decisions, however, would seem to be nullified by the recent decision of the United States Supreme Court in *Rocco* v. *Thompson*." We might add that the decision in the Court of Appeals of New York, *supra*, overruled those made in the lower courts of that State and the Ohio Supreme Court has settled the law for that State.

In our judgment, neither the Consul-General, nor the appellant, had a paramount or exclusive right to administer, and the lower Court was correct in refusing to revoke the letters which had been issued to the appellee. We have not thought it necessary to discuss the question raised by the

appellee, whether under our decisions the right of administration could be delegated by the Consul-General, inasmuch as we have reached the conclusion already announced as to him. As the treaty expressly states, "or, in his absence, the representative of such Consul-General, Consul, Vice-Consul-General or Vice-Consul," we would not have been inclined to hold that such representative could not have acted for the Consul-General, if we had thought the treaty with Sweden gave the later the paramount and exclusive right to administer, as contended by the appellant. Nor have we thought it necessary or desirable to pass on the motion to dismiss the appeal, or to now determine other questions which have been raised or suggested, as what we have said is sufficient for the purposes of the case before us.

As the action of the Consul-General in appointing the appellant his representative, etc., doubtless was taken in the discharge of what he deemed to be his duty, we will direct the costs to be paid out of the estate.

> *Decree affirmed, the costs to be paid out of*
> *the estate.*